## **EXHIBIT 2**



Neutral Citation Number: [2018] EWFC 23 (Fam)

Case No: FD13D05340

**IN THE HIGH COURT OF JUSTICE**
**FAMILY DIVISION**
**SITTING AT THE CENTRAL CRIMINAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/04/2018

Before :

**MR JUSTICE HADDON-CAVE**
- - - - - - - - - - - - - - - - - - - - -
Between :

TATIANA AKHMEDOVA      **Applicant**

- and -

(1) FARKHAD TEIMUR OGLY AKHMEDOV
(2) WOODBLADE LIMITED
(3) COTOR INVESTMENT SA
(4) QUBO 1 ESTABLISHMENT
(5) QUBO 2 ESTABLISHMENT      **Respondents**

- and -

(6) STRAIGHT ESTABLISHMENT
(an establishment formed in the Principality of Liechtenstein)
(7) AVENGER ASSETS CORPORATION
(a Panamanian company)

**Intended Respondents**

- - - - - - - - - - - - - - - - - - - - -

**Mr Dakis Hagen QC and Mr Andrew Holden**
(instructed by **Withers LLP**) for the **Applicant**
**The Respondents were not present or represented**

Hearing date: 21st March 2018
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

## MR JUSTICE HADDON-CAVE :

## INTRODUCTION

*Procedural history*

1.    A trial took place before me between 29th November and 5th December 2016 of an application for ancillary financial relief sought by the Applicant, Mrs Tatiana Akhmedova ("W") against the First Respondent, Mr Farkhad Akhmedov ("H").  H did not appear at the trial and was not represented.

2.    On 15th December 2016, I gave judgment granting W ancillary financial relief against H in the sum of £453,576,152, comprising 41.5% of the total marital assets (*AAZ v BBZ and Others (Financial Remedies: Sharing Principle: Special Contribution)* [2016] EWHC 3234 (Fam), [2018] 1 FLR 153) ("the Judgment").

3.    On 20th December 2016, I made a Financial Remedy Order ("the Main Order") giving effect to my Judgment (*AAZ v BBZ and Ors* [2016] EWHC 3361 (Fam)). I also granted a world-wide Freezing Order ("the Freezing Order").

4.    Pursuant to the Main Order:

      (1)    H was ordered to pay a lump sum of £350,000,000 to W and to transfer certain property to W.

      (2)    Various Panama and Liechtenstein corporate entities (Cotor, Qubo 1 and Qubo 2), which the Court had found to be (in the case of Cotor) a nominee and bare trustee for H and (in the case of Qubo 1 and Qubo 2) no more than 'ciphers' and the *alter ego* of H, were made jointly and severally liable for payment of the lump sum.

      (3)    Transfers of a modern art collection and cash from Cotor to Qubo 1 and/or Qubo 2 were set aside pursuant to s.37 of the Matrimonial Causes Act 1973 ("MCA 1973") and/or s.423 of the Insolvency Act 1986 ("IA 1986") on the basis that those transfers were undertaken at an undervalue.

      (4)    W's claims would only be dismissed when there had been "*full and complete compliance with this order*" (paragraph 21).

      (5)    There was liberty to apply to bring "*any other applications for enforcement purposes under s. 37 of the MCA 1973 and/or s. 423 of the Insolvency Act 1986*" (paragraph 27).

5.    The Main Order, therefore, specifically left open the prospect of further relief under the Matrimonial Causes Act 1973.  This was in accordance with the usual practice and had the effect of keeping the proceedings on foot (as the Court of Appeal confirmed in *Kerman v. Akhmedova* [2018] EWCA 307 at paragraph [28]).

6.    On 8th June 2016, I refused an application filed on behalf of W on 7th June 2016 seeking an order for subpoena *duces tecum* against Ross Henderson, the former head of H's family office in Zug, Switzerland.

7.  Since December 2016, W has been involved in litigation to enforce the Judgment against H in various jurisdictions around the world. W's efforts have been frustrated. W has achieved some success recently in the Isle of Man and Dubai:

    (1)  W has obtained court orders in the Isle of Man in respect of a helicopter and a private jet belonging to H – and intends to seek orders for the sale of these assets – but has been met with an argument by H that the Manx company that holds one of those assets owes substantial debts to Avenger Assets Corporation ("Avenger"), whom W seeks to join as the Intended Seventh Respondent in these proceedings.

    (2)  W has obtained orders in the courts of the Dubai International Financial Centre ("DIFC") in respect of the yacht, M.V. "Luna", title to which is currently held by another Liechtenstein 'Anstalt', Straight Establishment ("Straight"), whom W seeks to join as the Intended Sixth Respondent to these proceedings.

*This application for further relief*

8.  On 1st March 2018, pursuant to the liberty to apply, W issued an application in this Court seeking the following further orders to assist her in the enforcement of the substantive relief granted by the Main Order:

    (1)  the joinder of Avenger and Straight to proceedings under FPR r. 9.26B;

    (2)  suitable orders for service by alternative means deeming such service to have taken place on all respondents served with this application on 2 March 2018;

    (3)  declarations recognizing that M.V. "Luna" is beneficially H's asset and that Avenger and Straight are his alter ego;

    (4)  an order piercing Straight's 'corporate veil';

    (5)  declarations that Avenger and Straight are H's privies and through H have submitted to the jurisdiction;

    (6)  an order against Straight that it transfer M.V. "Luna" to W;

    (7)  orders under s. 37 MCA 1973 and s. 423 IA 1986 setting aside the cash transaction of €260m on 15 December 2014 which enabled M.V. "Luna" to be acquired by Avenger and an order that Avenger pay a sum representing the capital value of M.V. "Luna" to W (€260 million);

    (8)  orders under s. 37 MCA 1973 and s. 423 IA 1986 setting aside the transaction(s) by which Straight came to hold M.V. "Luna";

    (9)  in default of the transfer of M.V. "Luna" to W, orders that Straight do pay the sum of US$487,278,000 (the current insurance value of M.V. "Luna" or £346,600,841 (the capital value of M.V. "Luna") to W and that Avenger do pay the sum of €260 million to W;

    (10)    orders rendering Straight and Avenger jointly and severally liable under the lump sum order in paragraph 13 of the Main Order so that the H's liability is diminished *pro tanto* following any such payment; and

    (11)    an extension of the Freezing Order.

9.    The application is supported by affidavits of Ms Michaelides filed by W's solicitors, Messrs. Withers. Ms Michaelides explains the enforcement steps taken in the Isle of Man, Liechtenstein, Switzerland and DIFC/Dubai and H's attempts to frustrate enforcement against his assets by the 'interposition' of corporate entities. I accept her evidence.

10.    W is represented by Dakis Hagen QC and Andrew Holden of Counsel and Messrs Withers. The Respondents and Intended Respondents did not appear and were not represented before me on 21st March 2018. I deal with service below. W submits that time is of the essence in the enforcement proceedings in the DIFC and the IOM.

## The Isle of Man enforcement proceedings

11.    W registered the Judgment against H in the Isle of Man on 3rd August 2017. She also obtained a freezing injunction and disclosure orders, which revealed that three Isle of Man companies that hold the helicopter and the private yet – namely Carolina Limited ("Carolina"), Lucy Limited ("Lucy"), and Tiffany Limited ("Tiffany") – were, in fact, held by nominees for H's sole benefit.

12.    The directors of the Manx holding companies procured or permitted that the helicopter and the private jet be returned to Germany and the UK, respectively.

13.    W is seeking to enforce the Judgment (as registered in the Isle of Man) against these assets. However, this has been met by an allegation that the Manx holding companies owe substantial sums of money to H, Cotor and Avenger.

14.    Ms Michaelides explains there is no evidence to support the assertion that these debts are due. W submits that the obvious inference is that H is manufacturing these alleged debts in order to attempt to dilute his equity in the Manx holding companies, so as to prevent W from enforcing the Judgment against his interest.

15.    In the case of the debts claimed to be owed to H personally and to the corporate creature against which the court has already entered Judgment (Cotor), W seeks Third Party Debt Orders in the Isle of Man, so that execution can be levied against the alleged debts themselves.

16.    However, that solution is not currently available in respect of Avenger because orders were not originally made against Avenger itself. W submits that the court should now make such orders because it is clear that Avenger is simply another of H's corporate 'ciphers'. Entering judgment against Avenger would be efficacious because it would enable W to garnish any such alleged debts owed to Avenger as a mechanism for enforcement of the Judgment.

17.     The following points are pertinent:

    (1)     In 2014, H transferred the proceeds of sale of his stake in Northgas into Cotor, which is a Panamanian 'bearer share' company, which this Court found to be H's nominee. There is no evidence of any consideration having been paid by Cotor for receipt of these assets (Judgment, paragraph 77).

    (2)     In February 2014, H entered into a contract to purchase M.V. "Luna" in his own name for €260 million. The vessel was placed in the name of Tiffany (Judgment, paragraph 67).

    (3)     In December 2014 and, significantly, after W says that the marriage finally came to an end, Tiffany 'sold' M.V. "Luna" to Avenger (Judgment, paragraph 67). H owned Avenger and the funds for this purported 'purchase' came from H's own bank account (Judgment, paragraph 68).

    (4)     In March 2015, H then purported to assign his shares in Avenger and other companies to a Bermuda law discretionary trust, of which he himself was the settlor, principal beneficiary and protector (Judgment paragraph 93). This was a transparent attempt to hide H's interest in the companies that owned the luxury assets – and by extension to hide those assets, including M.V. "Luna" – as a result of the threat of W's claims (Judgment, paragraph 94). These transfers were set aside on the basis that they were made by H with the intention of defrauding his creditors (Main Order, paragraph 17).

    (5)     On 15th December 2014, Avenger received the sum of €260,000,000 from H's bank account in order to 'purchase' M.V. "Luna" from Tiffany, despite the fact that Tiffany was just another H-owned company and had received an assignment of the contract to acquire the yacht directly from H himself. Avenger's registered agent and Cotor's registered address were the same. Cotor was H's nominee.

18.     In the circumstances, I find and hold that the transfer by H of €260 million to Avenger, and the payment of that sum by Avenger to Tiffany, was a deliberate mechanism by which H tried falsely to pretend that the ownership of M.V. "Luna" was held notionally by a Panamanian company, rather than by an Isle of Man company (where enforcement is possible). The timing of the alleged change in ownership is telling, *i.e.* at the end of 2014 after it was clear that the marriage finally ended (Judgment, paragraphs 38 and 50).

19.     Accordingly, for these reasons, I make the orders sought against Avenger directly.

**The Dubai enforcement proceedings**

20.     W's lawyers, Messrs Withers, discovered that in or about October 2017, M.V. "Luna" sailed into Dubai and was put into dry-dock for maintenance. This may have been because H assumed that Dubai was well beyond the reach of an English Court judgment. It appears that Messrs Withers, however, knew better. They knew that, in fact, the Courts of DIFC (the international commercial freezone in Dubai) have the following special attributes: (a) they are courts of the Common Law which apply Common Law principles regarding the enforcement of foreign judgments; (b) they

have a reciprocal enforcement relationship with the Courts of Dubai itself; and (c) they exercise a so-called 'conduit jurisdiction', by which judgments that are registered in the DIFC Courts can then be taken to the Courts of Dubai for execution. Accordingly, it is possible for parties to seek to execute foreign judgments in Dubai *via* the DIFC Courts. It is by this route that W is now seeking to execute the Judgment against M.V. "Luna" and seeks further orders from this originating Court to do so.

*Histology of evasion*

21.     The histology of H's dealings with M.V. "Luna" are redolent of his elaborate and contumacious campaign to evade and frustrate the enforcement of the Judgment debt against him. New facts have recently come to light and been drawn to this Court's attention which reinforce that picture. The true sequence of events appears to be as follows.

22.     H transferred M.V. "Luna" into the name of Tiffany, but then procured a dummy 'sale' of the vessel to Avenger, using funds from his own bank account. However, unbeknown to W and this Court, during the trial in December 2016, Avenger did not, in fact, continue to hold title to M.V. "Luna". It transpires that H had taken a rapid series of further surreptitious steps to attempt to place his yacht further beyond the reach of enforcement. The sequence of events was as follows. On 30th November 2016 (*i.e.* the second day of the trial before me), M.V. "Luna" was transferred from Avenger to another Panama entity, Stern Management Corporation ("Stern"). On 1st December 2016, M.V. "Luna" was transferred by Stern to Qubo 2 and was re-registered as a Marshall Islands vessel. On 20th December 2016, this Court found that Qubo 2 was no more than H's 'cipher' and *alter ego* and made an order that Qubo 2 was jointly and severally liable to W for the sum of £350 million. On 28th December 2016, the Lichtenstein Court made a freezing order against Qubo 2 prohibiting the disposal of M.V. "Luna" and made payment orders against Qubo 2.

23.     In breach of the Orders of the English and Lichtenstein Courts, however, on 8th March 2017, Qubo 2 transferred M.V. "Luna" to Straight. Straight appears to be current title-holder of the vessel (at least on current information).

24.     The newly created vehicle, Straight, would appear to be the antithesis of its name. The transfer M.V. "Luna" by Qubo 2 to Straight was made despite the fact that Qubo 2 had been made jointly and severally liable for payment of the lump sum award under the Judgment, and in breach of breach of the freezing injunction granted by the Liechtenstein Courts in W's favour as aforesaid.

25.     In my judgment, it is clear that Straight is simply another 'cipher' and *alter ego* of H, and another attempt by H to evade enforcement. Straight is another Liechtenstein 'Anstalt'. Straight operates from the same address as Qubo 2. Straight has the same individual directors who operate Qubo 2, *i.e.* one of H's known 'ciphers'. Straight was incorporated on 17th February 2017, after Judgment had been entered against H and Qubo 2. The timing is again telling. Straight was incorporated, and the vessel transferred from Qubo 2 to Straight, in the midst of W's initial attempts to enforce the Judgment against Qubo 2 in Liechtenstein. On 23rd February 2017, Qubo 2 appealed the orders made by the Liechtenstein Court on 28th December 2017. The freezing

order was upheld.  Title to the vessel was, nevertheless, transferred by Qubo 2 to Straight on 8th March 2017.

26.     In my judgment, there is an irresistible inference that these actions were taken at H's instruction, and in a deliberate attempt to place M.V. "Luna" beyond the reach of the orders that the English court had made against Qubo 2 and which W was threatening to execute in Liechtenstein.

27.     I have illustrated these recent developments in the attached amended organogram (which is the updated version of the one attached to my Judgment of 15th December 2016).

*Dubai proceedings*

28.     W instructed counsel and lawyers in Dubai (Michael Black QC, Andrew Holden and Messrs Fitche & Co).  On 8th February 2018 W obtained a freezing injunction in the DIFC against H and Straight which prevented them from disposing of or dealing with M.V. "Luna".  Acting as a delegate of the DIFC Courts, and on the basis of the DIFC freezing injunction, on 13th February 2018 the Court of Dubai granted a precautionary attachment of M.V. "Luna".   As a result, M.V. "Luna" was effectively impounded in Port Rashid where she remains under court order.

29.     Straight immediately instructed its own counsel and lawyers who then applied to set aside the freezing injunction on the basis that the DIFC only has personal enforcement jurisdiction over H and not Straight.  Straight's challenge to the continuation of the DIFC freezing injunction was, therefore, on the basis that the English Court had only entered judgment directly against H and not against Straight.  It should be noted, however, that (i) Straight was incorporated two months after the English Judgment was entered and (ii) the transfer of M.V. "Luna" was effected by Qubo 2 in breach of the Freezing Order (see above).

30.     On 8th March 2018, Straight obtained an urgent hearing of its application to set aside the DIFC order.   On 11th March 2018, the DIFC Courts dismissed Straight's application and ordered the continuation of its freezing injunction, with written reasons to follow.

31.     The DIFC Courts also declined to have an urgent appeal against its decision listed for the week commencing 18th March 2018.  W submitted that this was a transparent attempt by Straight (and H) to overturn the DIFC freezing injunction prior to the hearing of the current application before the English Court listed for 21st March 2018. Straight was named as the Second Respondent in those proceedings and H was named as the First Respondent in those proceedings.  Straight's lawyers admitted that they were funded by a third party.  I infer that this must be H.

32.     In the course of the hearing before me on 21st March 2018, the DIFC Courts' reasons were published and handed up to me. In a 50-paragraph detailed judgment, H.E. Justice Ali Al Madhani set out the full history of the English proceedings and the *gravamen* of the English Judgment and said this:

> "44.  In my judgment, I agree with the argument put forward by
> the Applicant that as a matter of fundamental policy, this court

– like any other court of justice – must be in a position to respond to fraud and deliberate evasion. It would deny the Court's jurisdiction of much of its practical effect if it were possible to avoid the enforcement of a judgment in the DIFC by the simple expedient of placing one's assets within a corporate entity in an offshore 'secrecy' jurisdiction, see Beatson LJ in *JSC BTA Bank v Ablyazov* [2014] 1 WLR 1414 [36];

> a. "The jurisdiction to make a freezing order should be exercised in a flexible and adaptable manner so as to be able to deal with new situations and new ways used by sophisticated and wily operators to make themselves immune to the Courts' orders or deliberately to thwart the effective enforcement of those orders".

45. This 'flexibility principle' was referred to with approval by Lewison LJ in *JSC Mehzprom Bank v Pugachev* [2016] 1 WLR 160 who said at [20] in the context of the construction of a freezing order, but making a point of principle of general application:

> "It would, I think, be a matter of concern if a person could make himself judgment-proof merely by setting up discretionary trusts or, as Patten LJ said, a Liechtenstein Anstalt".

46. Further, I refer to the dictum of Robert Walker J (as he then was) in *International Credit & Investment Co (Overseas) Ltd v Adham* [1998] BCC 134, at 136:

> "the Court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level"

47. Accordingly, this Court's jurisdiction to ratify and enforce foreign judgments extends to the making of orders against corporate entities such as the Second Respondent, if it can be shown that they are being used to conceal the assets of the judgment debtor.

48. As to this case and in order or to the level of granting a Freezing injunction only I am satisfied that the Applicant has a good arguable case to believe that Vessel Luna, held through Straight the Second Respondent, was and continues to be owned and controlled by Mr Akhmedov the First Respondent personally which gives this Court the jurisdiction and the power to enforce against it with a view to enforcing a recognised English Judgment."

33.     H.E. Justice Ali Al Madhani concluded as follows:

>       "50.   It is important to take into account that the Freezing
>       Injunction was also granted based on the Applicant's intention
>       to obtain judgment against Mr Akhmedov which extends to
>       enforcement against Straight as his corporate creature in the
>       English High Court.

>       51.   Furthermore, the Applicant put forward evidence that an
>       application against the Second Respondent was issued in the
>       English High Court on 1 March 2018 and the hearing of that
>       application is due to take place on 21 March 2018. In this
>       regard, the Freezing Injunction preserves the position pending
>       the entry of judgment in England, and the ratification and
>       enforcement of that judgment in the DIFC."

34.     I take full account of the judgment of H.E. Justice Ali Al Madhani and express the
        gratitude of this Court to the DIFC for its valuable assistance and comity.

*W's submissions*

35.     Mr Dakis Hagen QC submits that entry of judgment against Straight in these
        (English) proceedings would self-evidently be of real value in the DIFC proceedings.
        First, because the DIFC Courts has statutory jurisdiction to ratify foreign judgments, a
        judgment directly against Straight would strengthen W's argument that the DIFC
        Courts have jurisdiction over Straight. H is clearly Straight's privy; H has submitted
        to the jurisdiction of this Court in these proceedings; accordingly, Straight will be
        incapable of contending other than that it has done so as well.   Second, because
        Straight's challenge to the DIFC freezing injunction is based on the allegation that the
        DIFC Courts have no jurisdiction over Straight, the entry of judgment against Straight
        would defeat, or at least greatly assist in defeating, its jurisdictional challenge. Third,
        because W's substantive claim against Straight in the DIFC is based on the contention
        that Straight is H's 'cipher' and *alter ego*. If this Court pierces the 'corporate veil' of
        Straight, it is believed that ultimately this will assist in securing the same form of
        relief against Straight in the DIFC, on the basis the DIFC Courts will pay regard to
        the findings and orders made by the English court in this respect.

36.     Mr Hagen QC contends that, by reason of paragraphs 21 and 27 the Main Order, any
        claim under the general law incidental to the granting of matrimonial orders remains
        fully open. On this basis, he seeks relief in the form of declarations of beneficial
        ownership and piercing of the 'corporate veil'.

## ANALYSIS

### (1)    Joinder and service

37.     W seeks the joinder of Avenger and Straight pursuant to FPR rule 9.26B on the basis
        that (i) it is desirable to add the new parties so that the court can resolve all the
        matters in dispute in the proceeding, or (ii) there is an issue involving the new parties
        and an existing party which is connected to the matters in dispute in the proceedings
        and it is desirable to add the new party so that the court can resolve that issue.

38.     W submits that the Respondents and Intended Respondents to this application have been properly served and had more than the requisite 7 days' notice of this application pursuant to Part 18.   W sent the application and supporting materials to H, Qubo 2, Avenger and Straight by a variety of methods.    There is no requirement for permission to serve outside the jurisdiction in matrimonial proceedings (FPR rule 6.41).   I accept Ms Michaelides' evidence regarding the steps taken to serve this application and supporting material and that all such Respondents and Intended Respondents received the documents on 2nd March 2018.

39.     W seeks an order validating the steps taken to serve the application and supporting materials on the Respondents and Intended Respondents.   W further submits that earlier service on H should, in any event, be deemed to be good service on Avenger and Straight.

*The principles*

40.     The following principles emerge from the authorities:

(1)     The legal principles of common law and equity which have to be applied in the Family Division and in the Family Court are *"precisely the same as in the Chancery Division, the Queen's Bench Division and the County Court"* (*per* Sir James Munby, President of the Family Division in *Kerman v. Akhmedova* [2018] EWCA Civ 307 at [21]-[22]).   In other words, courts exercising family jurisdiction *"do not occupy a desert island in which general legal concepts are suspended or mean something different"* (*per* Lord Sumption JSC in *Prest v Petrodel Resources Ltd and others* [2013] UKSC 34, [2013] 2 AC 415, at paragraph [37]).

(2)     The Court has power retrospectively to validate a step that brings a claim or document to be served to the attention of the defendant as being good service.   This is implicit in CPR rule 6.37(5)(b)(i) which gives the court discretion to *"give directions about the method of service"* in cases of service out, or is to be implied generally into the rules for service out (*per* Lord Clarke of Stone-Cum-Ebony JSC in *Abela v. Baadarani* [2013] 1 WLR 2043 paragraph [20]).

(3)     Notwithstanding the absence of an equivalent of CPR rule 6.37(5)(b)(i), the Court had jurisdiction under the FPR to permit service out of the jurisdiction by alternative means and urgency will often be a feature of family cases especially those involving children (*per* Moylan LJ in *Wilmot v Maughan* [2017] EWCA Civ 1668 at paragraphs [127]-[129]).   It follows that the court must have jurisdiction under the FPR retrospectively to validate alternative service.

(4)     Save where there is a multilateral or bilateral convention governing service in the foreign jurisdiction - in which case a more stringent *"exceptional circumstances"* test applies (*c.f. Marashen Ltd v Kenvett Ltd* [2018] 1 WLR 288) - the jurisdiction to authorise or validate service by alternative means is established if the serving party can show *"a good reason"* for effecting service in that way.   The use of the indefinite article *"a good reason"* is significant: one good reason only is sufficient (*per* Atkins LJ in *Kaki v National Private Air Transport Co* [2015] 1 CLC 948, at [28]).

(5)     The mere fact that service by alternative means will be quicker and more convenient will not, of itself, constitute *"a good reason"* justifying service by those alternative means. However, proof of lengthy delay in the context of the case itself if the service treaty method is used may constitute a good reason to authorise alternative service (*per* Haddon-Cave J in *Bill Kenwright Ltd v Flash Entertainment FZ LLC* [2016] EWHC 1951 (QB), [54]; and see David Foxton QC in *Marashen v Kenrett* [2018] 1 WLR 288 at [55]-[56]).

(6)     Where service by alternative means is sought, it must be shown that such means would not contravene the laws of the territories in which service has been effected (see *Abela* (*supra*) and *Embassy of Brazil v de Castro Cerqueira* [2014] 1 WLR 3718, at paragraph [29]).

*Application of the principles to this case*

41.     In my judgment, the following points are pertinent and amount collectively to *"a good reason"* for the Court to exercise its discretion to validate service by alternative means in this case:

(1)     First, it is clear on the unchallenged evidence of Ms Michaelides that service *via* judicial channels would be likely to take weeks, months or even years.

(2)     Second, the context of the present application is relevant, namely, the post-judgment enforcement phase where H has over the past 18 months repeatedly demonstrated a willingness to take rapid and multifarious steps to evade enforcement at every turn.

(3)     Third, the urgency and time-critical nature of the present application is demonstrated by Straight's (*i.e.* H's) recent attempt to have Straight's jurisdictional challenge in Dubai expedited so as to come on before the hearing of this application in England.   It is clear that time is of the essence in the enforcement proceedings in the DIFC and the IOM.

(4)     Fourth, there is self-evidently a continuing risk that H will take every step available to him to seek to render the orders and judgments of this Court nugatory unless the Court acts with expedition.

(5)     Fifth, further and in any event, it is important for the process of enforcement against H's assets to proceeds with expedition so that they are not further dissipated or their value diminished in the meantime.

(6)     Sixth, local lawyers have confirmed that service by the methods used would not contravene the laws of the territories in which service has been effected.

42.     In my view, in any event, the above circumstances would also amount to *"exceptional circumstances"* under the more stringent test required in Hague Convention State cases.   The exceptional steps taken by H to evade enforcement in this past 18 months give rise to exceptional circumstances.

43. Further, and in any event, for similar reasons to those in my first Judgment where I held that earlier service on H was deemed good service on Cotor, I hold that service of this application on H is good service on Avenger and Straight (see Judgment, paragraphs [122]-[129]).

44. For these reasons, in my view, service by alternative means on the Respondents (see above) should be permitted and validated and I so order. Accordingly, I declare that service of the application is deemed to have taken place on the Respondent and the Intended Respondents on 2nd March 2018.

**(2)     Application to pierce the 'corporate veil' of Avenger and Straight**

45. W seeks judgment directly against Avenger and Straight on the grounds that Avenger and Straight are mere 'ciphers' of H being used by him to evade this Court's Judgment and the 'corporate veil' should be pierced.   W seeks such relief in addition to her application against them under s.423 IA 1986 and s. 37 MCA 1973 (see further below).

46. Mr Hagen QC puts forward two grounds to justify the entering of judgment directly against Avenger and Straight on the basis of the principles outlined in *Petrodel Resources Ltd v Prest* [2013] 2 AC 415. First, in respect of both Respondents, W submits that Avenger and Straight are mere 'nominees' for H, and hold their assets for him beneficially.  Second, in respect of Straight, W also submits that that, in cases of 'evasion', the court is entitled to pierce the 'corporate veil' and thereby hold Straight directly liable on the Judgment against H.

*'Nominee-ship'*

47. Nominee-ship is a *"highly fact-specific issue"* (as Lord Sumption JSC said in *Prest*, at [52]).  The question is whether the assets of Avenger and Straight can be said to belong beneficially to H as the effective controller of those entities.  In my judgment, there is no difficulty in answering this question in the affirmative in both cases.  The Court has already made declarations that Cotor, Qubo 1 and Qubo 2 are all nominees for H and hold their assets absolutely for H.   The circumstances and timing of Avenger and Straight's creation are redolent of the same mischief.  In my view, it is clear that (just like Cotor, Qubo 1 and Qubo 2) Avenger and Straight are mere 'ciphers' designed by H to evade enforcement.

48. I find and hold that H never intended to part with his beneficial ownership in the assets transferred to Avenger and Straight who continue to hold beneficially for H. The transfer of €260,000,000 from H's bank account to Avenger was part of a *faux* sale of M.V. "Luna" to Avenger by Tiffany after the divorce proceedings herein had been issued.  However, at the time, H was both the ultimate owner of Avenger, and the ultimate beneficial owner of Tiffany.  There was no reality or validity to this transaction: it was merely a device whereby H (a) moved title to M.V. "Luna" into a Panama company and (b) divested himself of a very substantial sum of money under the cloak of an artificial sale arrangement.  There is no difficulty in inferring, in all the circumstances, that H did not genuinely intend to part with beneficial ownership of either the cash or the vessel but intended to remain the real owner throughout.  This is a clear case of the beneficial owner simply trying to change the label on the tin.

49.    I further find and hold that, by reason of the fact that H provided all the purchase monies for no apparent consideration, there is a presumption of resulting trust which has not been rebutted (*c.f. Prest, passim*).

50.    Accordingly, a declaration is sought in respect of H's continuing ownership of the assets of Avenger and Straight. W uses the language of 'nomineeship' so as to mirror the language used in the original Judgment, and because the concept of 'nomineeship' is more likely to be understood in, for example, civil law jurisdictions in which W may seek to have the Judgment recognised and enforced in due course. However, various terms may be used to describe this arrangement including 'resulting trustee', 'bare trustee' or 'nominee'.

*Piercing the 'corporate veil'*

51.    The second ground invoked by W is that Straight is being used by H deliberately to evade or frustrate enforcement of the Judgment against him, such that the court should pierce the 'corporate veil' and hold Straight liable directly for the Judgment debt.

52.    The following propositions can be derived from the Supreme Court's judgment in *Prest*:

53.    First, historical terms such as 'facade' and 'sham' in fact refer to two separate and distinct principles: the 'concealment principle' and the 'evasion principle'. In simple terms, the distinction between the concealment principle and the evasion principle can be likened to the distinction between 'lifting' and 'piercing' the 'corporate veil' (*per* Lord Neuberger of Abbotsbury PSC in *Prest*, at paragraph [60]). As Lord Sumption JSC explained at paragraph [28]:

> "*The concealment principle is legally banal and does not involve piercing the corporate veil at all. It is that the interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant. In these cases the court is not disregarding the "facade", but only looking behind it to discover the facts which the corporate structure is concealing. The evasion principle is different. It is that the court may disregard the corporate veil if there is a legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement*".

54.    Second, the evasion principle applies where a person deliberately frustrates enforcement by interposing a company under his control, the court may pierce the 'corporate veil'. As Lord Sumption JSC said at paragraph [35]:

> "*[T]there is a limited principle of English law which applies when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control. The court may then*

> *pierce the corporate veil for the purpose, and only for the
> purpose, of depriving the company or its controller of the
> advantage that they would otherwise have obtained by the
> company's separate legal personality."*

55.    Third, the remedy of piercing the 'corporate veil' should, however, only be used
where necessary to achieve justice.  As Lord Sumption JSC said at paragraph [35]:

> *"[I]f it is not necessary to pierce the corporate veil, it is not
> appropriate to do so, because on that footing there is no public
> policy imperative which justifies that course".*

56.    Fourth, there is a distinction between merely acting 'improperly' in dealing with
assets and acting with 'impropriety' in the sense of deliberately concealing or evading
legal obligations.  As again explained by Lord Sumption (at paragraph [36]):

> *"36.   In the present case, Moylan J held that he could not
> pierce the corporate veil under the general law without some
> relevant impropriety, and declined to find that there was any.
> In my view he was right about this. The husband has acted
> improperly in many ways. In the first place, he has misapplied
> the assets of his companies for his own benefit, but in doing
> that he was neither concealing nor evading any legal
> obligation owed to his wife. Nor, more generally, was he
> concealing or evading the law relating to the distribution of
> assets of a marriage upon its dissolution. It cannot follow that
> the court should disregard the legal personality of the
> companies with the same insouciance as he did. Secondly, the
> husband has made use of the opacity of the Petrodel Group's
> corporate structure to deny being its owner. But that, as the
> judge pointed out at para 219 "is simply [the] husband giving
> false evidence." It may engage what I have called the
> concealment principle, but that simply means that the court
> must ascertain the truth that he has concealed, as it has done.
> The problem in the present case is that the legal interest in the
> properties is vested in the companies and not in the husband.
> They were vested in the companies long before the marriage
> broke up. Whatever the husband's reasons for organising
> things in that way, there is no evidence that he was seeking to
> avoid any obligation which is relevant in these proceedings.
> The judge found that his purpose was "wealth protection and
> the avoidance of tax". It follows that the piercing of the
> corporate veil cannot be justified in this case by reference to
> any general principle of law."*

57.    The facts of the present case can be usefully contrasted to those of in *Prest* set out
above.  I am satisfied that, in the present case, H is acting with real impropriety and
deliberately seeking to evade his legal obligations to W by employing the devices of
Avenger and Straight to put legal obstacles in the way of enforcement of the
Judgment by her against him.  Accordingly, in my judgment, the 'evasion' principle
applies and it is appropriate to piece the 'corporate veil' in this case and I do so.

*Conflicts of law question*

58.   I turn to consider the conflicts of law question as to the applicable law to a case of
      piercing the 'corporate veil'.   W submits that the appropriate law is the *lex fori, i.e.*
      English law.

59.   A choice of law question arises in cases which concern the piercing of the veil of a
      foreign incorporated company.   As Lord Neuberger of Abbotsbury PSC explained in
      *VTB Capital plc v Nutritek International Corp* [2013] 2 AC 337, at [131]:

>      "[T]hat question is whether the proper law governing the
>      piercing of the corporate veil is the lex incorporationis, the lex
>      fori, or some other law (for example, the lex contractus, where
>      the issue concerns who is considered to be party to a contract
>      entered into by the company in question). The ultimate
>      conclusion may be that there is no room for a single choice of
>      law rule to govern the issue... However, given that it has been
>      common ground throughout these proceedings that the issue is
>      to be resolved pursuant to English law, it is inappropriate to
>      say more about this issue".

60.   In *Excalibur Ventures LLC v Texas Keystone Inc* [2013] EWHC 2767 (Comm), at
      paragraphs [1136] – [1145] Christopher Clarke LJ decided that the *lex incorporationis*
      should apply to the question whether the 'puppeteer' of a company should be held
      liable for that company's breach of contract.   However, *Excalibur* would appear to
      involve the 'concealment principle' (*i.e.* the question whether the 'corporate veil'
      could be 'lifted') as opposed to the 'evasion principle' (*i.e.* the question whether the
      'corporate veil' could be 'pierced').   It is noteworthy that *Prest* was not referred to in
      *Excalibur*.

61.   There would appear to be no authority determining the question of the proper law in
      relation to a claim based on the 'evasion' principle.   In my judgment, a principled
      analysis to this question includes the following considerations.   First, a consideration
      of the legal nature of the 'evasion' principle.   In my view, the 'evasion' principle is
      clearly *remedial* in nature.   It aims to prevent dishonest attempts to evade
      enforcement.   The 'evasion' principle was developed to respond to dishonest attempts
      to evade enforcement of a subsisting obligation or liability by the stratagem of the
      interposition of a company or legal entity to thwart enforcement.   Second, the well
      established general rule is that questions as to mode and method of enforcement and
      available remedies are for the *lex fori*: "*As a matter of English common law, the
      nature of the remedy is a matter of procedure to be determined by the lex fori*" (*Dicey,
      Morris & Collins on Conflict of Laws*, 15th Edn, 7-011).   Third, there are sound
      reasons of common-sense and policy as to why the general *lex fori* rule should apply
      to cases concerning the 'evasion' principle.   The Court should be astute not to aid
      evasion.   To apply the *lex incorporationis* in relation to the 'evasion' principle would
      be to do the international fraudster's job for him: it would permit enforcement to be
      subverted simply by the use of corporate structures in jurisdictions with no such
      exceptions to the 'veil' of incorporation.

*Reasons for piercing Straight's 'corporate veil'*

62.     In summary, in my view, the following circumstances justify an order piercing the 'corporate veil' so as to make Straight directly liable on the Judgment against H.

63.     First, it is clear that, when M.V. "Luna" was transferred to Straight, both the legal owner (Qubo 2) and the true beneficial owner (H) were under an existing legal liability not to do so pursuant to the Judgment and violated their legal obligations by doing so.

64.     Second, it is clear from the evidence that Straight was incorporated deliberately to make enforcement of the Judgment against Qubo 2 (and H) more difficult by the interposition of a 'fresh' corporate entity, against which Judgment had not been entered.   Indeed, given the circumstances in which Straight was created and interposed, the only sensible inference is that the sole purpose of the incorporation of Straight and the transfer to it of M.V. "Luna" was to evade enforcement of the Judgment.  Straight's entire *raison d'etre* was evasion of the subsisting Judgment.

65.     Third, I am satisfied that the making of an order piercing the 'corporate veil' is clearly necessary in the interests of justice. This Court's Order and Judgment must be taken to the DIFC to be enforced.  It is not possible to determine at this stage whether the more conventional remedies W seeks against Straight will be recognised and given effect in the DIFC.  It is quite possible that the only order that the DIFC Courts will recognise and enforce is an order of this Court based on a finding that H has used Straight in a dishonest fashion so as to evade enforcement of the Judgment.  There is, conversely, a possibility that if no such Order is made, W's efforts to enforce the Judgment in Dubai could fail altogether.

66.     For these reasons, in my judgment, the test for piercing the 'corporate veil' set out in *Prest* is clearly satisfied in the present case and the interests of justice require the making of such an order in this case.

*Submission of Avenger and Straight to the jurisdiction*

67.     I am satisfied, as presaged above, that Avenger and Straight can be said, parasitically, to have submitted to the Court's jurisdiction.  The reasoning is the same as that in the case of Qubo 1 and Qubo 2, namely H had fully and voluntarily submitted to the jurisdiction and participated in the proceedings until the month of the trial.  Avenger and Straight are mere 'ciphers' of H, being at the very least bare trustees for H.  An order against a trustee (*a fortiori* a bare trustee) binds the beneficiary and vice versa on grounds of privity (see *Gleeson v J Wippell & Co* [1977] 1 WLR 510 at pp. 514C & ff).   H's earlier submission to this court binds Avenger and Straight, even if they have purported not to submit.  I make appropriate declarations accordingly to this effect.

68.     It should be noted that W (rightly) does not presently seek an order piercing the 'corporate veil' in respect of Avenger because the other, more conventional relief sought against Avenger is likely to be sufficient to secure Third Party Debt Orders in the Isle of Man against it (although W reserves the right to apply in due course to do so should that become necessary).

### (3)      Transfer order under s. 24(1)(a) MCA 1973

69.     Part II of the MCA 1973 confers wide powers on the court to order ancillary relief in matrimonial proceedings. Section 23 provides for periodical and lump sum payments to a spouse or for the benefit of children of the marriage. Under section 24(1)(a), the court may order that:

> "*a party to the marriage shall transfer to the other party... such property as may be so specified, being property to which the first-mentioned party is entitled, either in possession or reversion*"

Section 25 provides for a number of matters to which the court must in particular have regard in making such orders, including:

> "*[the] income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future*"

70.     As Lady Hale explained in *Prest* (*supra*) at [84], when agreeing with Lord Sumption that the properties in question were held by the Respondent companies on trust for the husband:

> "*84   I agree that this appeal should succeed, on the basis that the properties in question were held by the respondent companies on trust for the husband. As he is beneficially entitled to them, they fall within the scope of the court's power to make transfer of property orders under section 24(1)(a) of the Matrimonial Causes Act 1973 . It also means that the court has power to order that the companies, as bare trustees, transfer these properties to the wife.*"

71.     I have held and declared that Straight holds M.V. "Luna" absolutely for H (see above).   It is, therefore, open to this Court to transfer M.V. "Luna" into W's name under s. 24(1)(a) MCA 1973 ("the Transfer Order") and order that all necessary steps be taken by H and Straight to vest M.V. "Luna" in W's name.   For the reasons outlined above, in my judgment, this is a paradigm case for such an order to be made and I so order.

72.     W undertakes that, to the extent that she is able to realise M.V. "Luna" following such transfer, she will give full credit for all proceeds of sale against the lump sum order made in her favour (*i.e.* £350 million before interest and costs).   I accept this undertaking.

### (4)      Section 423 Applications and s. 37 MCA 1973 applications

73.     The Court has already made orders under sections 423–425 of the IA 1986 setting aside and making payment orders in respect of (i) the transfer of H's interest in Avenger to the Bermuda discretionary trust and (ii) the purported transfer of the modern art collection and Cotor's cash to Qubo 1 and/or Qubo 2  (see paragraphs 92-107 of the Judgment).

74.     W now seeks further relief under sections 423–425 IA 1986 and/or section 37 MCA 1973 in respect of two other transactions: (i) the payment by H to Avenger of €260,000,000; and (ii) the transfer of M.V. "Luna" by Qubo 2 to Straight.

*Section 37 MCA 1973*

75.     The principles applicable in respect of section 37 MCA 1973 are out in the Judgment at paragraphs 96-97 and do not require repetition.

76.     The current application, in respect of the payment by H to Avenger of €260 million, is outside the relevant 3-year statutory period which creates the presumption that dispositions within this period fall to be set aside. However, I am satisfied that disposition should be set aside on the facts under section 37 for the same reasons as it is impugned under s. 423 IA 1986 (see further below).

77.     The relevant analysis is as follows. The statutory presumption under section 37 MCA 1973 does apply in respect of the disposition of M.V. "Luna" from Qubo 2 to Straight. This is because this disposition took place on 8th March 2017, *i.e.* within a year of the issuance of the present application. Section 37 requires the reviewable disposition to have been made by a party to the marriage. I found and held in paragraph 7 of my supplemental judgment dated 20th December 2016 that Qubo 2 was the 'cipher' or *alter ego* of H. Thus, the disposition of M.V. "Luna" to Straight, though purportedly by Qubo 2, was in fact made by H. Since this disposition was made within the last three years, there is a rebuttable presumption that it falls to be set aside. H has not appeared nor served any evidence rebutting this presumption. Accordingly, an order under section 37 MCA 1973 should be made. I declare for the same reasons that the disposition of M.V. "Luna" by Qubo 2 to Straight was void *ab initio* (*c.f.* Judgment, paragraph 97).

*Section 423 IA 1986*

78.     The general principles pursuant to which the court exercises its jurisdiction under section 423-425 IA 1986 are set out in my Judgment at paragraphs 102-107 and it is not necessary to rehearse them again here (see also Sales J in *4Eng Ltd v Harper* [2010] BCC 746, at paragraphs [9] – [16]). When determining whether a relevant purpose exists, it need not be established that the purpose was the sole or a dominant purpose; it is sufficient if the relevant purpose is a "*real substantial purpose*" of the transaction (see *IRC v Hashmi* [2002] 2 BCLC 489, [25], *per* Arden LJ). So long as a sufficient connection to the jurisdiction is shown so as to make it "*just and proper to make the order against [the transferee] despite the foreign element*", it is well established that s.423 may be given extra-territorial effect: see *Erste Group Bank AG, London Branch v JSC 'VMZ Red October'* [2015] 1 CLC 706, [116], and the cases cited therein. In my judgment, sufficient connection is established in this case by the fact that the transfers were deliberately effected to evade an English claim brought by the spouse of the transferor, who was resident in England.

*Application of principles*

79.     In my judgment, applying these principles to the facts of the present case, the requisite conditions for the exercise of the court's statutory jurisdiction are clearly fulfilled for the following reasons. First, I am satisfied that the relevant transactions were for nil

consideration: Avenger and Straight are both 'ciphers' for H with no independent commercial existence of their own. Despite his ongoing duty of full and frank disclosure (under *e.g. Jenkins v Livesey* [1985] AC 424), H has disclosed no assets of these entities which could have enabled them to give full consideration for a transfer by H to Avenger by H of €260,000,000, or by H to Straight of a vessel worth $487,278,000 (on 2017 insurance values).   Second, I am satisfied that the real substantial purpose of the transactions was to place assets beyond the reach of W's claims, as part of what I have already referred to as the "*wider pattern of conduct by H designed to put his assets out of the reach of W*" (see Judgment, paragraph 100 and the findings at paragraphs 19 – 20 that H's conduct has been "*seriously iniquitous*" and that he has displayed a "*naked determination to hinder or prevent the enforcement of W's claim*"). Third, I am satisfied that neither transaction served any genuine commercial purpose. Both transactions were between entities that are known corporate 'ciphers' of H.  It is clear that, in each case, H was on both sides of the transaction. Both transactions were undertaken in the shadow and wake of W's substantial ancillary relief claims against H.  In the case of the Avenger transaction, this was done after it became clear that there was no prospect of the marriage being revived.  In the case of the Straight transaction this was after there was a substantial money judgment against Qubo 2 and H.  In summary, I am satisfied that these transactions form part of H's continuing deliberate and dishonest campaign to avoid his liabilities under the Judgment.

*Relief*

80.   I am satisfied that robust and immediate relief is required in this case for the following reasons.  First, the transactions form part of H's continuing campaign to defeat W by concealing his assets in a web of offshore companies; and, as such, the court should fashion the fullest possible remedy to combat H's dishonest conduct (*c.f.* Sales J in *4Eng*).  Second, the relief and remedy should be fashioned in light of the facts 'on the ground' and in a manner that gives the best prospects of protecting W's position as a creditor; and in practice, that means directing the orders against Avenger and Straight as the transferees.  Third, the Court should seek to make practical orders that stand the best prospect of being recognised and enforced in the jurisdictions in which it is intended to seek enforcement: namely, Isle of Man and DIFC and Dubai.

81.   In these circumstances, I am satisfied that the same or similar considerations and orders are appropriate as the Court made in relation to Qubo 1 and Qubo 2, *i.e.* declaring the transactions void under s. 37 MCA 1973 and setting them aside under s.425(1)(a) and making orders pursuant to s.425(1)(d) "[requiring] *any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct*".

82.   Accordingly, in default of the above Transfer Order being satisfied within 7 days, I make the following orders:

   (1)   In respect of Avenger, an order that it pay W the sterling equivalent of €260,000,000; and

(2)   In respect of Straight, an order that Straight pay W the full value of the lump sum award against H up to the current value of the asset (namely, the current insurance value of M.V. "Luna" of $487,278,000) on the basis that the value of the asset placed beyond W's reach is greater than the total value of her claim.

83.   To avoid any risk of double recovery, I order that Avenger and Straight's payment obligations are to be joint and several with those of the existing obligations under the Judgment. In this way, execution against Avenger or Straight would reduce *pro tanto* the Judgment debt, and *vice versa*.

84.   I am satisfied that these direct payment orders will be efficacious and assist enforcement of the Judgment by enabling W (i) to seek registration of a liquidated money judgment against Avenger in the Isle of Man; (ii) to seek Third Party Debt Orders in order to execute Judgment against Avenger's alleged rights against Carolina; and (iii) to seek enforcement of a liquidated money judgment against Straight in DIFC, which would improve the prospects of maintaining the DIFC freezing injunction and, ultimately, of executing the Judgment against M.V. "Luna".

**(5)      Extension of post-judgment freezing injunction to Avenger/Straight**

85.   W also seeks the extension of the post-judgment freezing injunction made in December 2016.

86.   I am satisfied that, both because of and notwithstanding H's history of hitherto disobedience of English Court Orders, it would be appropriate to extend the freezing injunction to cover also his 'ciphers', Avenger and Straight.  An extension may encourage and enable other Courts around the world with control of H's assets to assist this Court in enforcement as a matter of comity as the DIFC has done. Accordingly, I so order.

## CONCLUSION

87.   In conclusion, for the above reasons, I grant W's application for relief and make the Orders set out in the Order signed by me on 21st March 2018.

MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akhmedov and ors



21 of 21